Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2015 | **DATE** | 8/20/2002 |
| **CASE TITLE** | Stephen Qualkenbush vs. Harris Trust & Savings Bk et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions to dismiss are denied. Status hearing set for September 10, 2002 at 9:15am.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 5 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | AUG 21 2002 date docketed | |
| | Notified counsel by telephone. | | | 28 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | AUG 21 2002 date mailed notice | |
| WAH | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEPHEN QUALKENBUSH, )
)
)
Plaintiff, )
)
vs. ) No. 02 C 2015
)
HARRIS TRUST & SAVINGS BANK; )
HARRIS BANK BARRINGTON, N.A.; )
EQUIFAX INFORMATION SERVICES )
LLC; and TRANS UNION, LLC, )
)
Defendants. )

MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Qualkenbush filed suit against defendants Harris Trust and Savings Bank (Harris Trust), Harris Bank Barrington, N.A. (Harris Barrington) (collectively, the banks), Equifax Information Services LLC and Trans Union LLC. He alleged violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 *et seq.*, and the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), 815 ILCS 505/1 *et seq.* Defendants have filed motions to dismiss for failure to state a claim. Fed.R.Civ.P. 12(b)(6). For the following reasons, those motions are denied.

## BACKGROUND

In April 2000, plaintiff's daughter Brooke M. Golueke attempted to buy a car. When she initially applied for credit she was informed that she would need another person's signature to get the loan. Plaintiff agreed to sign the contract along with his daughter. On April 17, 2000, they both signed a retail installment contract with the dealer, who then



assigned the contract to Harris Barrington. Both plaintiff and his daughter signed as buyers and both names appear on the car's title, but the daughter took delivery alone. Plaintiff maintained an account at Harris Trust, which is under common ownership with Harris Barrington.

In August 2001, Golueke defaulted on her contract. On October 22, 2001, without notifying plaintiff of his daughter's default, Harris Trust debited plaintiff's account in the amount past due on the contract and paid it to Harris Barrington. On December 19, 2001, Harris Trust again debited plaintiff's account for an amount past due and paid it to Harris Barrington. As a result of these debits, made without his knowledge, plaintiff had a number of checks dishonored. Harris Barrington also reported the retail installment contract as a delinquent account of plaintiff to Experian, Equifax and Trans Union, three national credit reporting agencies.

On January 23, 2002, plaintiff sent demands to Harris Barrington that they cease reporting the retail installment contract as his debt, and to Experian, Equifax and Trans Union that they remove the purported delinquency from his credit report. Harris Barrington continues to report the contract as plaintiff's debt, and Equifax and Trans Union[1] continue to report the delinquency as plaintiff's.

## DISCUSSION

When deciding a Rule 12(b)(6) motion we must assume the truth of all well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994). We will dismiss a claim

---

[1] Although not specifically stated in the complaint, it can be inferred that Experian has ceased reporting the contract as delinquent on plaintiff's credit report.

only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Written instruments attached to the complaint are considered part of the pleadings. Fed.R.Civ.P. 10(c).

The complaint includes three counts. Count III alleges that the banks violated the ICFA by collecting money from plaintiff without notifying him of his daughter's delinquency. Count II alleges that the banks violated the FCRA by falsely reporting to credit agencies that plaintiff himself was delinquent, despite their failure to comply with the ICFA's notice requirement. And count I alleges that Equifax and Trans Union violated the FCRA by failing to properly investigate and correct the allegedly false information in plaintiff's credit report. Because the claims are all dependent on how plaintiff's obligation to Harris Barrington is characterized, we begin with count III.

## Count III - ICFA Claim Against Harris Trust and Harris Barrington

The ICFA protects cosigners from arbitrary enforcement by their principal's creditors. It requires that the creditor give the cosigner 15 days' notice of the principal's default – during which the cosigner can make payment arrangements – before taking any adverse action against the cosigner. 815 ILCS 505/2S (Section 2S). Harris Barrington did not notify plaintiff of his daughter's default before arranging for Harris Trust to collect the money from plaintiff's account. At issue is whether plaintiff was a cosigner and therefore entitled to protection under Section 2S. There is no Illinois caselaw construing the breadth of Section 2S or defining "cosigner."

Plaintiff maintains that he only became involved in this transaction after his

daughter's initial credit application was denied, and that he did so to lend her his credit. This, he maintains, makes him a "cosigner." The banks argue that the contract explicitly identifies plaintiff as a "co-buyer," primarily liable for the debt, and therefore not a cosigner.

The banks' position rests on the premise that one cannot be both primarily liable and a cosigner. The statute uses the terms "cosigner" and "primary obligor" to describe the two signatories:

> No person may report adverse information to a consumer reporting agency ... regarding a *cosigner* of an obligation unless prior thereto, such person has notified the *cosigner* by first class mail that the *primary obligor* has become delinquent or defaulted on the loan, that the *cosigner* is responsible for the payment of the obligation and that the *cosigner* must, within 15 days from the date such notice was sent, either pay the amount due under the obligation or make arrangements for payment of the obligation.

815 ILCS 505/2S (emphasis added). Although this text clearly refers to two different parties, it does not necessarily mean that the definitions are mutually exclusive. The language merely portrays the paradigm case, with one creditor, one primary obligor and one cosigner. There are, of course, infinite variations on this transaction that would still implicate the statute. Although the statute refers to all parties in the singular: "person," "the cosigner" and "the primary obligor," there could easily be multiple creditors, cosigners or primary obligors.

The fact that there are so many different terms that can apply to one in plaintiff's position – one who accepts some level of responsibility for another's debt – often results in ambiguity. Terms such as "guarantor," "surety" and "cosigner" are frequently used interchangeably, as are "principal" and "primary." In some cases there are legally significant distinctions among them. In others, they have overlapping meanings. Our task is to discern what the legislature meant in this context.

We presume that they intended Section 2S to make sense within the existing statutory regime. To help understand its terms we look to another statute that also applies to this transaction, the Illinois Motor Vehicle Retail Installment Sales Act (MVRSA).[2]

Cosigners

§18. Each person, other than a seller or holder, who signs a retail installment contract may be held liable only to the extent that he actually receives the motor vehicle described or identified in the contract, except that a parent or spouse or any other person listed as an owner of the motor vehicle on the Certificate of Title issued for the motor vehicle who co-signs such retail installment contract may be held liable to the full extent of the deferred payment price notwithstanding such parent or spouse or any other person listed as an owner has not actually received the motor vehicle described or identified in the contract and except to the extent such person other than a seller or holder signs in the capacity of a guarantor of collection.

The obligation of such guarantor is secondary, and not primary. The obligation arises only after the seller or holder has diligently taken all ordinary legal means to collect the debt from the primary obligor, but has not received full payment from such primary obligor or obligors, or after the primary obligor has become insolvent, or service of summons cannot be obtained on the primary obligor, or it is otherwise apparent that it is useless to proceed against the primary obligor.

No provisions in a retail installment contract obligating such guarantor are valid unless:

(1) there appears below the signature space provided for such guarantor the following:

"I hereby guarantee the collection of the above described amount upon failure of the Seller named herein to collect said amount from the buyer named herein."; and

---

[2] Plaintiff moved to strike any argument based on the MVRSA, asserting that the banks raised this statute for the first time in their reply brief. The banks, in turn, claim that motion to strike itself raised new issues. We agree that the MVRSA should have been raised in the initial briefs. We also find, however, that a discussion of the MVRSA, and the way it interacts with the ICFA, are essential to understanding Section 2S. Plaintiff's motion to strike effectively serves as a surreply. Counting the response and reply to the motion to strike, we now have three briefs from each side. Any unfair surprise has been mitigated and all parties have had ample opportunity to be heard.

(2) the guarantor, in addition to signing the retail installment contract, signs a separate instrument in the following form:

### "EXPLANATION OF GUARANTOR'S OBLIGATION

You _____ (name of guarantor) by signing the retail installment contract and this document are agreeing that you will pay $_____ (total deferred payment price) for the purchase of _____ (description of goods or services) purchased by _____ (name of buyer) from _____ (name of seller).

Your obligation arises only after the seller or holder has attempted through the use of the court system to collect this amount from the buyer.

If the seller cannot collect this amount from the buyer, you will be obligated to pay even though you are not entitled to any of the goods or services furnished. The seller is entitled to sue you in court for the payment of the amount due."

The instrument must be printed, typed, or otherwise reproduced in a size and style equal to at least 8 point bold type, may contain no other matter (except a union printing label) than above set forth and must bear the signature of the co-signer and no other person. The seller must give the co-signer a copy of the retail installment contract and a copy of the co-signer statement.

815 ILCS 375/18 (Section 18). This provision creates a general rule that only the person who actually receives the car can be held primarily liable, while others can only sign the contract as a "guarantor of collection," whose obligation is secondary and "arises only after the seller or holder has diligently taken all ordinary legal means to collect the debt from the primary obligor." A select class of people – the recipient's parent or spouse, or a person whose name appears on the vehicle's title – can be primarily liable despite not receiving the vehicle.

Plaintiff is the recipient's father and his name appears on the title, so he falls within the select class. All this means, however, is that plaintiff was not limited to serving as a guarantor of collection. It still leaves his precise capacity in this transaction undefined. Once again, caselaw provides little guidance. There is one line of cases, culminating in Lee v. Nationwide Cassel, L.P., 675 N.E.2d 599 (Ill. 1997), interpreting a guarantor's liability under

Section 18, but there is none defining a parent's obligations. Notably, this section is entitled, "Co-signers." And it specifically says that "a parent ... who co-signs ... may be held liable to the full extent of the deferred payment price ... ." This suggests that a parent, whose liability under Section 18 can be co-extensive with the recipient, is still considered a cosigner.

Although it is not controlling with respect to Illinois law, the FTC's definition of "cosigner," promulgated as part of its Credit Practice Rule, is helpful in that it emphasizes the same factors as Section 18:

> Cosigner. A natural person who renders himself or herself liable for the obligation of another person without compensation. The term shall include any person whose signature is requested as a condition to granting credit to another person, ... . A person who does not receive goods, services or money in return for a credit obligation does not receive compensation within the meaning of this definition. A person is a cosigner within the meaning of this definition whether or not he or she is designated as such on a credit obligation.

FTC Credit Practices Rule, 16 CFR §444.1(k). In responding to public comments, the Commission explained:

> The phrase "another person" will avoid confusion between a cosigner and a principal debtor. Clarifying language has been added defining a cosigner as one who enables a consumer to receive goods, services or money, but does not receive such goods, services or money himself. ... We have added language which makes it clear that a person is a "cosigner" under this rule, whatever he or she is called by a creditor, if he or she meets the definition in the rule.

49 Fed. Reg. 7740, 7779 (March 1, 1984). There is no reference to primary or secondary liability within this definition. And similar to Section 18, it makes the receipt of property decisive in distinguishing between the signatories: the person who receives the goods, services or money is the principal, and the person who receives nothing is a cosigner. Significantly, the definition itself is controlling, regardless of how the parties label themselves.

Defendants' insistence that Section 2S's use of "primary obligor" precludes its

application to anyone who is primarily liable is misplaced. Consider that a surety, as opposed to a guarantor, is primarily liable for the principal's debt. Defendants' position would mean that a creditor could report a surety as delinquent on a debt without even notifying the surety of the principal's default. Both Section 18 and the FTC definition distinguish between the "principal obligor" and "cosigners," based on who actually receives the property not the nature of the liability. We believe that Section 2S intends to utilize this same distinction, the use of the word "primary" instead of "principal" notwithstanding. This construction also makes Section 2S more meaningful. Limiting the notice requirement to cosigners who were only secondarily liable would render it virtually inconsequential. Before attempting to collect, the creditor would have had to exhaust ordinary legal remedies against the principal, a much more severe limitation than Section 2S. The real benefit conveyed by Section 2S is that it gives notice and 15 days to arrange payment to a primarily liable cosigner, such as a surety, who would otherwise be immediately liable and might unwittingly become delinquent.

The banks also contend that one who is primarily liable does not need notice of the principal's default because that party's obligation is effective immediately upon signing the contract. This ignores both common practice and the present course of dealing. The principal, who has possession of the product, typically makes the monthly payments on the installment contract, as Golueke had made all the payments for the first 15 months under this contract. A cosigner, even a primarily liable surety, will not necessarily have immediate notice of any defaults, as plaintiff did not know of his daughter's default. Section 2S

addresses these realities, while imposing a minimal burden on creditors.[3]

Taken together, these statutes recognize that there are really (at least) three categories of signers. On one end are co-buyers, such as spouses who both "receive" the car. They are jointly liable on the obligation, and the creditor can proceed immediately against either without any special notice. On the other end is a guarantor, who is only secondarily liable. The creditor must proceed against the principal before seeking payment from the guarantor. Somewhere in between is a primarily liable cosigner, such as a parent or spouse of the recipient under Section 18. Section 2S still applies, but the creditor need not take legal action against the principal before turning to the cosigner. Protecting this middle group does serve a useful economic function. Dealers would be unwilling to sign installment contracts with young buyers who had insufficient independent income if they had to go through the largely futile exercise of suing the child before turning to the cosigning parents for payment. And classifying parents as co-buyers leaves them vulnerable to being wrongfully declared delinquent because, assuming the child no longer lived with them, the "cosigner" could quite conceivably not have actual notice of the default. Section 2S provides for such notice while imposing a minimal burden on the creditor.

This construction gives meaningful effect to all the statutory provisions discussed above. The recipient of the property is the "principal" or "primary" obligor. Any signers who do not receive property, such as those whose purpose is solely to lend credit, are "cosigners" under Section 2S. In the specific context of retail installment contracts for motor

---

[3] By securing a cosigner who is within the special class defined by Section 18, the creditor will only need to comply with Section 2S before recovering from the surety, instead of having to exhaust all legal remedies against the principal before taking action against a guarantor.

vehicles, unless the cosigner is a parent, spouse or named on the title, Section 18 classifies the cosigner as a guarantor of collection. If the cosigner is within that class, the cosigner can accept primary liability. But this only means that the creditor can turn to the cosigner without prolonged legal proceedings against the principal, not that they forfeit their right to Section 2S notice. Regardless of any recitals in the contract, so long as one does not receive any property or compensation, that person is still considered a cosigner.[4]

Plaintiff has alleged that he signed the contract to lend his credit to his daughter, that she received the car and that he received no compensation. This adequately pleads that he was a consigner, entitled to Section 2S protections. It remains possible, of course, that plaintiff was a principal under this contract and therefore not entitled to any Section 2S notice. But we cannot make that determination on the pleadings.

## Count II - FCRA Claim Against Harris Trust and Harris Barrington

The banks raise two arguments here. First, they maintain that the information they provided to the credit agencies was accurate because plaintiff was a primary obligor, was not entitled to Section 2S notice, and therefore was delinquent. Having rejected that argument above, we turn to the second, that even if they did collect and report the debt improperly, they did not negligently (15 U.S.C. §1681o) or intentionally (15 U.S.C. §1681n) report false information. The banks claim that they believed they could legally collect from plaintiff and report him to credit agencies, and that their belief was reasonable because there is no definitive caselaw declaring that someone in plaintiff's position is a cosigner.

---

[4]There is nothing in Section 2S that conflicts with the FTC's admonition that we ignore how the party's designate themselves in favor of a rule based on who receives property. Section 18, in fact, seems to endorse this principle.

We disagree. The absence of precedent interpreting who qualifies as a "cosigner" for Section 2S purposes may be relevant to the banks' mental state, but it is not dispositive. This is not a qualified immunity case where a plaintiff must establish that a defendant violated "clearly established law," and the absence of binding precedent can itself be sufficient to dismiss a claim. The standard for proving negligence is much more lenient.

Mental state is a factual question typically decided by a jury, and one we are loathe to scrutinize at this stage of litigation. We do not know what the banks were thinking when they decided to collect from plaintiff's account and to report his alleged delinquency to the credit agencies. But federal notice pleading does not require the complaint to state specific facts establishing mental state. Plaintiff adequately alleges that the banks had the proper mental state. There are multiple sets of facts consistent with these allegations and on a motion to dismiss we cannot entertain the banks' factual arguments to the contrary.

### Count I - FCRA Claim Against Equifax and Trans Union

Equifax and Trans Union rely exclusively on the banks' argument that their characterization of the debt was accurate. We have already found that plaintiff has sufficiently alleged that Harris Barrington acted improperly. Having raised no independent arguments, Equifax's and Trans Union's motions to dismiss must also be denied.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied.

*JAMES B. MORAN*
Senior Judge, U. S. District Court

Aug. 20, 2002.